*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* CASTILLO/DELLEH, Minors.

UNPUBLISHED
November 22, 2022

No. 360877
Wayne Circuit Court
Family Division
LC No. 2021-000760-NA

Before: GLEICHER, C.J., and SERVITTO and YATES, JJ.

PER CURIAM.

On February 28, 2022 the circuit court took jurisdiction over three of respondent-mother's six children based on physical abuse and neglect in their mother's home and the father of two of the children's failure to comply with a safety plan.[1] The record evidence clearly supported the court's jurisdiction and we affirm.

## I. BACKGROUND

On July 30, 2021, Child Protective Services (CPS) received a report that respondent-mother's home was filthy, her children were unbathed, and respondent had physically abused them. When CPS and police agents visited the home, they found CC and respondent's children with Wilber Prieto—WP, IP, and EP. The children were dirty and had a foul odor. They could not remember when they had last bathed or eaten. The children described that respondent would not let them sleep and forced them to drink energy drinks and clean the house all night. They also described being struck with belts, spatulas, electrical cords, and a paint ball gun, and accused respondent of shooting the paint ball gun at them as punishment. Twelve-year-old CC indicated that respondent often went out at night and left her to babysit her younger siblings.

WP, IP, and EP were returned the care of their father. He secured a court order for sole custody and those three children are no longer subjects of these child protective proceedings. CC was sent with her younger half-sisters—AZ and AH—to the home of the younger children's

---

[1] CC's father abandoned her and was never a party in these proceedings. Wilber Prieto is the father of WP, IP, and EP. He has taken sole custody of his children. Chris Delleh is the father of AZ and AH, respondent's youngest children.

paternal aunt. The father of AZ and AH—Chris Delleh—took custody of these three children under a safety plan. Over the following month, Delleh left the children in respondent's care on several occasions, even after a CPS agent strictly forbid this. The Department of Health and Human Services (DHHS) also attempted to provide mental health services for respondent. Respondent had previously been diagnosed with bipolar and post-traumatic stress disorders, and had been hospitalized at one point. She had stopped taking her medication and was no longer under any doctor's care. Respondent declined the DHHS's offer of services in this regard, insisting she did not suffer from mental illness.

On August 30, 2021, the DHHS filed a petition for temporary wardship of CC, AZ, and AH. The petition alleged that respondent neglected or refused to provide proper or necessary support, education, medical, surgical, or other care necessary for the children's health or morals, or subjected the children to a substantial risk of harm to their mental well-being, or abandoned the children without proper custody or guardianship. Further, the petition alleged that the "home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of [respondent,] . . . is an unfit place" for the children. The petition requested the removal of the children from respondent's home for reasons including an unfit home, physical neglect, physical abuse, and threatened harm. The caseworker acknowledged that when she made a surprise visit on August 12, 2021, the home had running water and adequate food was available. CC indicated that this change only occurred after CPS became involved. The court granted the petition and the children were placed in nonrelative foster care.

On October 5, 2021, the DHHS filed an amended petition for temporary wardship. The circuit court granted that petition as well and continued the children in foster care. While the children had been wards of the court, they had all exhibited signs of trauma and the court deemed it unsafe for them to return to respondent's care. Respondent was initially awarded supervised parenting time. However, workers observed respondent's inappropriate treatment of CC and CC expressed fear of her mother. Accordingly, the DHHS suspended respondent's visits with CC.

The court ultimately held a trial to establish jurisdiction over the children. The DHHS presented into evidence the children's reports of their experiences in respondent's care. The children reported that respondent's home was filled with clutter and garbage. Rotting food collected maggots. Respondent kept odd hours and forced the children to drink energy drinks so they could stay up all night and clean the house. The children described being hit with objects and shot at with the paintball gun. Once, respondent threatened to burn down the house with CC, WP, EP, and IP inside, and even lit a rug on fire to threaten the children. AZ and AH were too young to provide much information to the caseworkers. However, CC described that shortly before the children were taken into care, respondent yanked her sisters' hair extremely hard, pulling some hair out by the roots. The children indicated that there was not enough healthy food in the home, only a small number of snacks. They did not always have running water, and at one point, the toilet was broken for a month.

Respondent testified at the trial as well. She continued to deny that she suffered from any mental health issues. She claimed that she suffered from various physical ailments that forced her to sleep during the day and to be awake at night, and so she tried to adjust the children's sleep schedules to match hers. Respondent denied that she actually gave the children energy drinks, claiming that she gave them Kool-Aid and told them it was an energy drink.

-2-

The circuit court ultimately took jurisdiction over CC, AH, and AZ pursuant to MCL 712A.2(b)(1) and (2). Respondent appeals.

## II. ANALYSIS

In child protective proceedings, jurisdiction can be taken over a child if the DHHS establishes a ground under MCL 712A.2 by a preponderance of the evidence. *In re Kellogg*, 331 Mich App 249, 253; 952 NW2d 544 (2020). We review the court's underlying factual findings for clear error. *Id*. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004). The circuit court in this case took jurisdiction over the children under MCL 712A.2(b)(1) and (2),which state, in relevant part:

The court has the following authority and jurisdiction:

\* \* \*

(b) Jurisdiction in proceedings concerning a juvenile under 18 years of age found within the county:

(1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship . . . .

\* \* \*

(2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in . . . .

The DHHS more than adequately supported grounds to take jurisdiction over the children. The DHHS established by a preponderance of the evidence that respondent had "neglect[ed] or refuse[d] to provide proper or necessary support . . . or other care necessary" and had "subject[ed]" the children "to a substantial risk of harm to [their] mental well-being." MCL 712A.2(b)(1). The DHHS also established that respondent's home was "unfit" based at least on neglect. MCL 712A.2(b)(2).

Four of respondents' children described the paucity of food in their home. When CPS first responded to respondent's home, the children could not remember the last time they had eaten. Respondent had not provided hygiene care for her children; all four were filthy and malodorous. CC, who was only 12 years old, detailed how she was left alone to care for her younger siblings at night.

Most concerning was the evidence of physical abuse and threatening behavior. The children described that respondent gave them energy drinks and forced them to stay up all night cleaning. She struck them with objects and shot paint balls at them as punishment. She pulled her young child's hair out by the roots while attacking her. And respondent threatened to burn down the house with the children inside, going so far as to light a rug on fire. CC underwent psychological evaluation and therapy was recommended due to the trauma she endured. While respondent claims that her physical health limited her ability to supervise her children, her medical diagnoses cannot excuse this physical abuse.

Respondent contends that that the DHHS should have provided in-home services while leaving the children in her care instead of seeking court jurisdiction over CC, AZ, and AH. The failure to do so violated her constitutional right to care and custody of her children, respondent argues. "If the trial court orders placement of the children in foster care, it must make explicit findings that . . . reasonable efforts to prevent the removal of the child have been made or that reasonable efforts to prevent removal are not required." *In re Benavides*, 334 Mich App 162, 168; 964 NW2d 108 (2020) (quotation marks and citation omitted). But as acknowledged by this Court in *In re Williams*, 333 Mich App 172, 184; 958 NW2d 629 (2020), while "it is well recognized as public policy that separation of children from parents should be avoided if reasonably feasible," "*not* removing a child from an unfit parent can also be hazardous to the child's health."

Furthermore, MCL 712A.13a(9) provides for the placement of a child in foster care if the following conditions are met:

> (a) Custody of the child with the parent presents a substantial risk of harm to the child's life, physical health, or mental well-being.

> (b) No provision of service or other arrangement except removal of the child is reasonably available to adequately safeguard the child from risk as described in subdivision (a).

> (c) Continuing the child's residence in the home is contrary to the child's welfare.

> (d) Consistent with the circumstances, reasonable efforts were made to prevent or eliminate the need for removal of the child.

> (e) Conditions of child custody away from the parent are adequate to safeguard the child's health and welfare.

Here, the children were at a substantial risk of harm in respondent's custody based on evidence of physical abuse, and maintaining custody was contrary to the children's welfare because of that abuse. CPS made reasonable efforts to avoid placing the children in foster care by creating a safety plan with Delleh, but that plan failed. Accordingly, nonrelative foster care was

the best means to safeguard the children's health and welfare.

We affirm.

/s/ Elizabeth L. Gleicher
/s/ Deborah A. Servitto
/s/ Christopher P. Yates