*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* OM, Minor.

UNPUBLISHED
June 11, 2025
11:58 AM

No. 373430
Genesee Circuit Court
Family Division
LC No. 22-138053-NA

Before: YATES, P.J., and YOUNG and WALLACE, JJ.

PER CURIAM.

Respondent-father appeals as of right the trial court's order assuming jurisdiction over the minor child, OM, under MCL 712A.2(b)(1) and (2). For the reasons set forth in this opinion, we affirm the trial court's order.

## I. BACKGROUND AND PROCEDURAL HISTORY

In March 2022, petitioner, the Department of Health and Human Services (DHHS), filed a petition to remove OM and her siblings from their mother's care based on reports of physical and emotional abuse, as well as their mother's declining mental health.[1] The trial court authorized DHHS's petition and placed OM with respondent-father, her legal father.[2] DHHS sought to make respondent-father a respondent in those proceedings because of his criminal record and history with CPS, but the trial court declined to do so. Respondent-father frequently expressed an unwillingness to care for OM and eventually placed her with his adult son. As OM's mother progressed in her services, the trial court returned the children to her care. However, the court later removed the children again in January 2023 after OM and her sibling, ZM, disclosed that their mother's boyfriend sexually abused them and that their mother was aware of the abuse. OM

---

[1] The children's mother is not a party to this appeal.

[2] Respondent-father is not the father of any of OM's siblings.

was again placed in respondent-father's care with the requirement that their mother only have supervised contact with OM and that their mother's boyfriend have no contact with OM.

Several issues arose while OM was in respondent-father's care. Respondent-father refused to bring OM to scheduled parenting-time visits with her mother, he refused to comply with subpoenas for OM to testify in her mother's case, he refused to let OM participate in court-ordered therapy, and he refused to let DHHS caseworkers meet with OM. Respondent-father's compliance with the court's orders improved slightly after the court chastised respondent-father for his noncompliance, but this improvement was only temporary. Respondent-father again refused to let OM testify in her mother's trial, he refused to let DHHS or OM's court-appointed special advocate (CASA) meet with her, and he continued to keep OM out of therapy. DHHS again sought to make respondent-father a respondent in the child protective proceedings after it learned that respondent-father allowed OM's mother and her boyfriend to have unsupervised visits with OM. Respondent-father also told OM's CASA that he wanted OM returned to her mother's care. The court authorized DHHS's petition and allowed for in-home jurisdiction while reiterating to respondent-father the court's orders.

The trial court removed OM from respondent-father's care in June 2024 after OM's caseworker and CASA reported concerns about OM's well-being in respondent-father's care. Respondent-father limited OM's access to people outside his home, OM's hair was matted and had mold in it, there were concerns about OM's nutrition, and there were concerns about respondent-father's temper with OM. Respondent-father still refused to let OM attend therapy, he refused to address OM's educational needs, and he frequently stated that he would return OM to her mother even if the court terminated her parental rights to OM.

At respondent-father's adjudication trial, the court heard testimony from OM's caseworker and CASA about respondent-father's noncompliance with the court's orders, respondent-father's refusal to address OM's mental-health and educational needs, and OM's demeanor around respondent-father after removal. Moreover, the court heard testimony that OM had "flourished" since her removal from respondent-father's care, including that she was engaged in therapy and doing very well academically. While respondent-father testified that he provided for all of OM's needs, OM's fictive kin[3] placement testified about OM's concerning weight, appearance, demeanor, academic performance, and eating habits after DHHS removed her from respondent-father's care. OM also testified that she was scared of respondent-father and scared that he would hit her, as he had threatened, when she got in trouble. She would often cry when in his care because she did not want to live with him. OM further testified that her hair was matted and had mold in it while living with him, and she had a "huge bump" that was bleeding because of how her hair was cared for. She said almost everything was better since she was removed from respondent-father's care.

---

[3] "Fictive kin" generally refers to a person who is at least 18 years old and who is not related to the child by blood, marriage, or adoption but who has a strong emotional connection or role in the child's life or an infant child's parent's life so that the person is considered a "relative," i.e., family. See MCL 712A.13a(1)(j)(*ii*).

Following the hearing, the trial court entered an order of adjudication concluding that statutory grounds to exercise jurisdiction existed under MCL 712A.2(b)(1) and (2). In reaching its decision, the court considered the testimony presented by each of the witnesses and expressed its concern about respondent-father's refusal to comply with the court's orders or cooperate with DHHS and the CASA staff. In particular, the court considered respondent-father's refusal to let DHHS or CASA staff meet with OM alone, his refusal to let OM participate in therapy, his refusal to discuss an Individualized Education Program (IEP) for OM, and his frequent statements about returning OM to her mother. The court was concerned that respondent-father did not believe OM's allegations of sexual abuse and it was concerned about the changes in OM's weight, demeanor, and hair while in respondent-father's care. The trial court found that petitioner had met its burden by a preponderance of the evidence in light of respondent-father's blatant disregard for court orders, his insistence on returning OM to respondent-mother, and OM's physical and mental condition in his care. This appeal followed.

## II. STANDARD OF REVIEW

We review a trial court's decision to exercise jurisdiction for clear error in light of the court's findings of fact. *In re BZ*, 264 Mich App 286, 295; 690 NW2d 505 (2004). "A finding is clearly erroneous if, although there is evidence to support it, we are left with a definite and firm conviction that a mistake has been made." *In re Long*, 326 Mich App 455, 460; 927 NW2d 724 (2018) (quotation marks and citation omitted).

## III. ANALYSIS

Respondent-father argues that the trial court clearly erred by finding that statutory grounds to exercise jurisdiction in his case existed by a preponderance of the evidence. We disagree.

The purpose of child protective proceedings is the protection of the child. *In re Brock*, 442 Mich 101, 107; 499 NW2d 752 (1993). "In Michigan, child protective proceedings comprise two phases: the adjudicative phase and the dispositional phase." *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014). Generally, a trial court determines whether it may exercise jurisdiction over the child during the adjudicative phase. *Id*. During this phase, the petitioner bears the burden of proving by a preponderance of the evidence that one or more of the statutory grounds for exercising jurisdiction exist. See *id*.; see also MCR 3.972(C)(1); MCR 3.977(E)(2). A "preponderance of the evidence" is evidence that, "when weighed with that [evidence] opposed to it, has more convincing force and the greater probability of truth." *People v Cross*, 281 Mich App 737, 740; 760 NW2d 314 (2008).

In the present case, DHHS asked the trial court to assume jurisdiction over OM pursuant to MCL 712A.2(b)(1) and (2), which authorize the court to exercise jurisdiction over a child in certain circumstances. MCL 712A.2(b)(1) provides that the trial court has jurisdiction over a juvenile under 18 years of age

> [w]hose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-

-3-

being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. . . .

MCL 712A.2(b)(2) provides that the trial court has jurisdiction over a juvenile under 18 years of age

[w]hose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in. . . .

"[T]he underlying purpose of the statutory scheme is to protect children from an unfit homelife." *In re Hockett*, 339 Mich App 250, 255; 981 NW2d 534 (2021) (quotation marks and citation omitted).

It is clear from the record that respondent-father, despite being able to do so, neglected or refused to provide OM with proper or necessary support and subjected her to a substantial risk of harm to her mental well-being. See MCL 712A.2(b)(1). Following testimony at respondent-father's adjudication, the trial court found that respondent-father refused to comply with the court's orders, he refused to cooperate with DHHS and CASA, and he refused to let OM participate in court proceedings regarding her mother. The court also found that respondent-father refused to let OM participate in therapy and refused to discuss or address OM's educational concerns. Further, the court found that respondent-father posed a risk to OM because of his insistence on returning OM to her mother. It was undisputed that respondent-father refused to let OM participate in court-ordered therapy while she was in his care. While OM's counselors recommended that OM participate in weekly therapy to address her trauma, respondent-father told OM's CASA that OM never experienced any trauma. Respondent-father also frequently told OM's caseworker that OM was lying about her alleged sexual abuse. OM's demeanor while in respondent-father's care was reserved, broken down, and timid, which differed from OM's demeanor outside of respondent-father's care. While OM struggled in respondent-father's care, he refused to let DHHS staff or OM's CASA meet with OM, despite court orders requiring him to do so. Respondent-father also lied to caseworkers about OM's location during welfare checks, he allowed OM's mother and her boyfriend to visit with OM unsupervised, and he frequently told OM's caseworker and CASA that he would return OM to her mother even if the court terminated her parental rights.

There was evidence that OM struggled academically while in respondent-father's care, but respondent-father refused to address her academic needs. OM struggled to read and she required her teachers to read assignments to her. OM's teachers recommended that OM have an IEP, but respondent-father refused. OM's academic performance and attendance in school improved significantly after she was removed from respondent-father's care. Further, there was evidence that OM's physical health deteriorated while in respondent-father's care. When DHHS removed OM from respondent-father's care, she was underweight, her hair was brittle and matted with scabs and mold, and she had developed abscesses in her mouth and teeth that required dental surgery. While respondent-father testified that he took OM to her medical appointments, he refused to provide DHHS with documentation about OM's medical care. Additionally, while respondent-father and OM reported that respondent-father fed OM three times a day, OM's fictive kin placement testified that OM did not like to ask for food and would overeat to the point of getting stomachaches. Petitioner clearly established by a preponderance of the evidence that respondent-

-4-

father neglected or refused to provide OM with proper or necessary support and educational, medical, or mental-health care and subjected her to a substantial risk of harm to her mental well-being, despite being able to provide for OM's needs. See *Cross*, 281 Mich App at 740. Accordingly, statutory grounds for the trial court to exercise jurisdiction existed under MCL 712A.2(b)(1).

The record similarly reflects that respondent-father's home or environment, by reason of neglect, cruelty, or depravity, was unfit for OM to live in. See MCL 712A.2(b)(2). As previously discussed with respect to MCL 712A.2(b)(1), there was evidence that when OM was removed from respondent-father's care she was underweight, her hair was brittle and matted with scabs and mold, and she had developed abscesses in her mouth and teeth. Respondent-father refused to provide DHHS with documentation about OM's medical care during the proceedings, and OM's caseworker could only verify that OM attended medical appointments after DHHS removed her from respondent-father's care. Additionally, OM's fictive kin placement testified that OM did not like asking for food and would overeat to the point of getting stomachaches when she did have access to food, causing OM's doctor to suggest that she had a trauma-induced eating disorder from not being fed the correct food or not being consistently fed. Throughout the proceedings, respondent-father limited OM's access to DHHS or CASA staff. When DHHS and CASA staff were able to meet with OM, OM expressed several concerns about living with respondent-father. OM herself testified that respondent-father would become upset with her and threaten to hit her when she was in his care. OM frequently cried in respondent-father's care because of how he treated her and because she did not want to live with him, and OM's fictive kin placement testified that OM often cried and shook after DHHS removed her from respondent-father's care. Even after removal, OM appeared to be very uncomfortable in respondent-father's presence and would disengage, fidget, and disassociate during parenting time with him. In light of the testimony presented at respondent-father's adjudication trial, petitioner established by a preponderance of the evidence that respondent-father's home was unfit for OM. See *Cross*, 281 Mich App at 740. Accordingly, statutory grounds for the trial court to exercise jurisdiction also existed under MCL 712A.2(b)(2).

In conclusion, because petitioner established statutory grounds for exercising jurisdiction under MCL 712A.2(b)(1) and (2), we are not left with a definite and firm conviction that the trial court made a mistake by exercising jurisdiction over OM. See *In re Long*, 326 Mich App at 460.

Affirmed.


/s/ Christopher P. Yates
/s/ Adrienne N. Young
/s/ Randy J. Wallace